**FILED**
Lucinda B. Rauback, Clerk
United States Bankruptcy Court
Savannah, Georgia
By cmurray at 5:10 pm, Mar 29, 2013

# In the United States Bankruptcy Court
## for the
### Southern District of Georgia
#### Savannah Division

In the matter of:           )

                           )        Chapter 7 Case

KENNETH R. HARDIGAN    )

                           )        Number <u>12-40484</u>

          *Debtor*       )

## OPINION AND ORDER ON SUNTRUST BANK'S AND THE UNITED STATES TRUSTEE'S MOTIONS TO CONVERT OR DISMISS

Debtor filed his Chapter 7 case on March 7, 2012. On May 17, 2012, SunTrust Bank ("STB"), a creditor in the case, filed a Motion to Convert to Chapter 11 or, in the Alternative, to Dismiss ("STB's Motion to Convert or Dismiss"). Dckt. No. 28.[1] The United States Trustee (the "UST") also filed a Motion to Convert to Chapter 11, or in the Alternative, to Dismiss Case ("UST's Motion to Convert or Dismiss") on May 23, 2012. Dckt. No. 36. After discovery, both STB and the UST filed Motions for Summary Judgment, which were denied. The Order denying STB's Motion for Summary Judgment was entered on December 19, 2012. Dckt. No. 110. The Order denying the UST's Motion for Summary Judgment was entered on December 20, 2012. Dckt. No. 111. In the Order denying the UST's Motion for Summary Judgment, the Court held that Debtor "passed" the Means Test. *Id.* Accordingly, the presumption of abuse does not arise in this case under 11 U.S.C. § 707(b)(2).

---

[1]For this Order, citations to the main bankruptcy case [12-40484] will appear as "Dckt. No. ___"; citations to K.A.P., Inc.'s Adversary Proceeding [12-4069] will appear as "A.P. Dckt. No. ___".

The remaining issues raised by both Motions to Convert or Dismiss under 11 U.S.C. §§ 707(b)(3) and 706 were tried on January 25, 2013. Based on the stipulations of the parties, the evidence introduced at trial, and the record in this matter, the Court now enters the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

Debtor is a sixty-year-old cardiologist. On the petition date, Debtor resided in a home located at 1 W. Bluff Drive in Savannah, Georgia (the "Bluff Drive Property"). This home was purchased in 2006 for $1,725,000.00 by One Bluff Drive LLC ("OBD"), a company of which Debtor is the sole owner, member, and manager. Statement of Facts Not in Dispute, Dckt. No. 87 at ¶¶ 49-51. The purchase of the Bluff Drive Property was financed by SunTrust Mortgage ("STM"). *Id.* at ¶¶ 52-53. In December 2006, OBD conveyed an undivided 1% interest in the Bluff Drive Property to Debtor. *Id.* at ¶ 54. Debtor continued to pay STM, the first priority mortgage holder on the property, up through February 2012, and continued to pay utilities for the property even after he moved out. *Id.* at ¶ 70; Debtor's Brief, Dckt. No. 124 at 7. Debtor moved out of the home in June 2012, and Debtor's home has now been surrendered and foreclosed upon. Statement of Facts Not in Dispute, Dckt. No. 87 at ¶ 67. Debtor's current monthly rent is $1,250.00. *Id.* at ¶ 68.

Prior to the petition, Debtor also owned two investment rental and vacation properties in Colorado. STB held the mortgages on these properties, and the mortgages were cross-collateralized by the Bluff Drive Property. The first Colorado property was sold after

about a year, but Debtor kept the second property until, at STB's urging, Debtor sold the property in 2010 for $2,300,000.00.[2] The STB mortgage on the property was paid off in its entirety from the sale, but Debtor testified that this sale amount was approximately $2,000,000.00 less than what the property had appraised for the summer before.

Debtor is currently employed as a principal in a local cardiology practice, Savannah Cardiology, PC. Statement of Facts Not in Dispute, Dckt. No. 87 at ¶ 71. He formerly earned a substantial additional salary as a contract cardiologist providing coverage at Meadows Regional Medical Center in Vidalia, Georgia, approximately 100 miles from the location of his principal practice in Savannah. Debtor's Exh. 14. He took on this job of seventy hours per month, in addition to his full-time medical practice, to attempt to deal with the financial difficulties that led to the filing of this case. That contract terminated in 2012. Debtor's Exh. 16. Because his principal practice already consumes 70-80 hours per week, Debtor has not attempted to replace the income derived from this outside work which, because of his exhausting regular schedule, is not reasonable to continue indefinitely.

While his 2011 and 2012 earnings showed substantially higher income as a product of this part-time work with Meadows Regional, the Debtor's income from Savannah Cardiology is the relevant income for the pending motion. In 2011, Debtor grossed $422,000.00 and netted $196,000.00 from that practice. Movant's Exh. 12. In 2012, his gross

---

[2] Except where the precise number is material, I will utilize rounded or approximate numbers throughout this opinion.

was $519,000.00 and his net was $201,000.00. Debtor's Exh. 13. At trial, Debtor testified that pending adjustments in Medicare and Medicaid could potentially further decrease his salary. Recent cuts have already caused Debtor's net income from his cardiology practice to decline by approximately 20%.

Debtor has three adult sons. His wife passed away in 2004, and so Debtor's household size is one. On the petition date, Debtor owned five automobiles free and clear of liens, three of which were not in working condition. Statement of Facts Not in Dispute, Dckt. No. 87 at ¶¶ 85-86. One vehicle was sold for scrap and the proceeds of that sale went to the Chapter 7 Trustee. *Id.* at ¶ 89. Debtor currently drives a thirteen-year-old Mercedes, and Debtor's sons have two of the vehicles. *Id.* at ¶¶ 87-88. Debtor maintains several term life insurance policies for the benefit of his sons. *Id.* at ¶ 82. The aggregate death benefit on the Debtor's term-life insurance polices is approximately $9,000,000.00, and Debtor claimed a deduction of $1,160.00 per month on his amended means test for the premiums associated with these policies. *Id.* at ¶ 83; Dckt. No. 39.

Debtor's major debts at filing were $1,700,000.00 to STM for his residence, a $905,000.00 construction loan from STB for a renovation to his residence, and a $875,000.00 disputed claim by K.A.P., Inc. ("K.A.P.") for unpaid cost overruns on the renovation project. These debts were evidenced in Debtor's schedules, which he filed with his petition and later amended on June 7, 2012. Dckt. Nos. 1 and 39. The amendments to

Debtor's schedules showed a reduced value of his real estate collateral (from $1,740,000.00 to $1,500,000.00), an increased amount of disputed liability to K.A.P. (from $550,000.00 to K.A.P.'s current claim of $875,524.35), and an increased amount of unsecured nonpriority debt, largely based on guaranty obligations to STB. *Id.*; *see also* Movant's Exh. 8. Debtor also amended his schedules to show that his debts were primarily consumer in nature and removed from Schedule J the monthly payment amount for the second mortgage on Debtor's residence. Dckt. No. 39.

Debtor's home has been foreclosed on, and so the potential unsecured claim on the STM loan is $200,000.00. Thus, his maximum exposure for unsecured claims by STM, STB, and K.A.P. is approximately $2,000,000.00. He also personally guaranteed $6,200,000.00 for STB loans to Savannah Cardiology. Movant's Exh. 8, Dckt. No. 39 at 9-10. However, his personal liability on these claims is capped at approximately 25% of that total or around $1,500,000.00.[3] Movant's Exh. 8.

The renovation project claim originates from a dispute between Debtor and K.A.P., which was hired to do a complete renovation to Debtor's home. After difficulties with plans and specifications supplied at no cost by K.A.P., Debtor engaged his own architect, and K.A.P. provided a base bid for the project of $1,100,000.00 to be funded by

---

[3] Debtor testified that at one time he was jointly and severally liable on certain of these obligations, but that they were later amended to reduce individual exposure to liability. STB filed four proofs of claim in this case for these guaranties and attached the personal guaranty documents that show Debtor's capped liability. Movant's Exh. 8.

AO 72A
(Rev. 8/82)

STB. Debtor's Exh. 1. Debtor has paid that amount in full and periodic reports from K.A.P. showed the project as 97% complete in October 2008. Debtor's Exh. 6 and 9.

However, in December 2008 K.A.P. billed an additional $276,000.00 (Debtor's Exh. 7), showed a balance due of $234,000.00 in February 2009 (Debtor's Exh. 9), and finally claimed cost overruns due of $314,000.00 in April 2009. Debtor's Exh. 10. These bills were largely undocumented, and Debtor testified that his inquiries into the bases for these overruns went unanswered.

To deal with the potential K.A.P. claim, Debtor had obtained a commitment from STB to advance another $350,000.00. Debtor tried to resolve the dispute until K.A.P. filed a contractor's lien in May 2009 for $544,000.00. Debtor's Exh. 11. When this occurred, Debtor decided not use the advanced $350,000.00 and returned it to STB. Both K.A.P. and STB sued Debtor. On the eve of trial, K.A.P. and Debtor entered into a week-long mediation with the assistance of the presiding Superior Court Judge. A settlement amount of $200,000.00 was determined, but any settlement was contingent on a feasible settlement with STB, and Debtor's negotiations with STB were unsuccessful. Statement of Facts Not in Dispute, Dckt. No. 87 at ¶¶ 115, 116. Debtor ultimately paid $85,000.00 to K.A.P. when his review of the records showed this amount to be attributable to added costs he was advised about before the work was done.

Debtor filed his bankruptcy case a week after this mediation. Prior to the petition, Debtor had incurred $161,125.52 in legal fees and expenses defending the K.A.P. and STB claims. Dckt. No. 130. As of February 4, 2013, Debtor had incurred $176,212.18 in legal fees and expenses in connection with that litigation. *Id.* K.A.P. initiated an Adversary Proceeding (No. 12-4069) against Debtor on October 17, 2012, asserting that its claim is non-dischargeable. Dckt. No. 80. This Court has allowed K.A.P. and Debtor to go forward with their state court litigation to determine the amount, if any, of Debtor's liability to K.A.P. for the renovation project, but has retained jurisdiction on the issue of dischargeability of K.A.P.'s claim under 11 U.S.C. § 523(a). A.P. Dckt. No. 13. At the hearing, the Court estimated K.A.P.'s claim to be $115,000.00.

Movants and Debtor entered into a Statement of Facts Not in Dispute, which was filed with the Court on October 30, 2012. Statement of Facts Not in Dispute, Dckt. No. 87. The Court adopts the parties' stipulations numbered 1-117 in full and incorporates this document by reference into this Order.

At trial, the parties agreed to the following additional stipulations:

(1) Claims 5, 6, 7, and 8 are claims of STB;

(2) Debtor's budget expense (Movant's Exh. 4-A, Dckt. No. 82, Line

13c) of $6,608.33 per month is a post-salary deduction for debt owed to LMC Funding.[4]

(3) Movant's Exhibit 4-A, dated September 9, 2012, shows disposable monthly income of $9,897.44 after Debtor's medical group deducts his pro-rata share of debt service on personal guaranties to STB and after the additional $6,608.33 per month is paid directly to LMC Funding.

(4) Movants do not challenge the propriety of either of the above deductions from Debtor's income.

(5) Movants do challenge the propriety of Debtor's expenditures of some $3,900.00 per month comprised of:

> (a) Insurance premium of $1,170.00 per month to purchase a term policy on Debtor's life worth $9,000,000.00 in death benefits to his adult sons;
>
> (b) Bookkeeper expenses of $575.00 per month;
>
> (c) Support of his adult sons for a portion of auto expenses of $600.00 per month and $800.00 per month in direct assistance;
>
> (d) Recreation expenses of $666.00 per month; and
>
> (e) Storage unit expenses of $175.00 per month.

Debtor, STB, and the UST filed post-hearing briefs on February 4, 2013.

---

[4] Debtor is funding $6,608.33 per month to assist his medical practice or an entity controlled by it in paying a substantial commercial debt, the LMC Funding payment. Debtor is not personally liable for the debt, which is non-consumer in nature, but Debtor has characterized his payment obligation as a condition of employment and that characterization has not been disproved.

Dckt. Nos. 124, 126, and 123. In their briefs, each party calculated and presented the Court with a projected payout over five years to unsecured creditors in a hypothetical Chapter 11 case, using various expense and income amounts. Ultimately, Debtor projected a payout of 21.9%, the UST projected a payout of 57.7%, and STB projected a payout ranging from 30.71%-47.53%. Debtor's Brief, Dckt. No. 124-1; UST's Brief, Dckt. No. 126 at 7; STB's Brief, Dckt. No. 123, Exh. A. These differences stemmed from various expense reductions and possible income levels of Debtor going forward. The principal difference, however, arose from the parties' calculations of unsecured debt in this case. Both STB and the UST only projected the unsecured claim amount to be approximately $1,200,000.00, while Debtor included his guaranty liability to STB (Claims 5, 6, 7, and 8) to the $1,200,000.00 to arrive at $2,617,912.04 in unsecured claims to be paid out over the life of a Chapter 11 plan. *Id.* The parties projected total disposable income levels available in a Chapter 11 ranging from $375,000.00 to $700,000.00 over sixty months. *Id.*

The Chapter 7 Trustee is currently holding for distribution approximately $185,000.00, which includes Debtor's 2011 tax refund of $137,000.00. Trustee's Oct. 2012 Interim Report, Dckt. No. 88; Debtor's Exh. 12. Debtor's 2012 tax refund will likely be around $110,000.00. These tax refund amounts are due to a net operating loss carryforward that will be consumed in 2012 and, going forward, will not shield any of Debtor's income from tax liability. Debtor's Brief, Dckt. No. 124 at 3; *see also* Debtor's Exh. 12.

LEGAL STANDARD

Currently pending before the Court are STB's and the UST's Motions to Convert or Dismiss. Dckt. Nos. 28 and 36. Movants primarily seek conversion or dismissal under 11 U.S.C. § 707(b)(3)(B), but as an initial matter, the Court will analyze their secondary arguments under 11 U.S.C. §§ 707(b)(3)(A) and 706(b).

Bad Faith under 11 U.S.C. § 707(b)(3)(A)

The UST argues that Debtor's case should be converted or dismissed under § 707(b)(3)(A) because Debtor's case was filed in bad faith. Section 707(b)(3)(A) provides that in considering whether the granting of relief would be an abuse, "the court shall consider whether the debtor filed the petition in bad faith." 11 U.S.C. § 707(b)(3)(A). Once the movant puts the debtor's good faith at issue, the burden shifts to the debtor to establish his good faith. *In re* McKay, 463 B.R. 915, 925 (Bankr. S.D. Ga. 2010) (Davis, J.); *In re* Smith, 229 B.R. 895, 897 (Bankr. S.D. Ga. 1997) (Dalis, J.). Good faith must be determined on a case-by-case basis, considering whether the provisions, purpose, or spirit of the bankruptcy laws have been abused. Smith, 229 B.R. at 897. Bad faith can be demonstrated by "concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish lifestyle, and intention to avoid a large single debt based on conduct akin to fraud, misconduct or gross negligence." *In re* Hibbard, 448 B.R. 296, 300 (Bankr. S.D. Ga. 2009) (Davis, J.) (quoting *In re* Zick, 931 F.2d 1124, 1129 (6th Cir. 1991)). Additionally, "bad faith can be established, inter alia, by a debtor's failure to significantly reduce his or her current

lifestyle to pay creditors." Smith, 229 B.R. at 898.

As support for his contention that Debtor's case was filed in bad faith, the UST asserts that Debtor "misrepresented his monthly expenses, misrepresented his true financial condition, sought to evade means test review by falsely claiming that this case involved primarily non-consumer debt, and disguised rather than disclosed his ability to repay creditors." UST's Brief, Dckt. No. 126 at 13. The UST also suggested that Debtor had a retaliatory motive for his attempt to remain in Chapter 7. *Id.*

I have examined the UST's contentions and find them to be without merit. Debtor's designation that this case involved primarily non-consumer debt is excusable in light of the complexity of his financial affairs. The character of his debt is related to the question of the size of his guaranty liability, which at one time was unlimited and was later capped. He amended his schedules to correct certain errors, and although the schedules were not further amended, no one was misled and all parties were made aware of the capped guaranty liability and Debtor's overall financial circumstances. I find no basis for a bad faith finding from these facts. *See* Hibbard, 448 B.R. at 301 (no finding of bad faith where omissions and errors on schedules were due to an innocent misunderstanding of the information sought or inadequate or sloppy record keeping and reporting). On the contrary, Debtor has exhibited good faith throughout his case by surrendering his home, driving a thirteen-year-old car, negotiating with creditors to avoid bankruptcy, and being cooperative

with the Chapter 7 Trustee and other parties.

Therefore, Debtor's case should not be dismissed or converted pursuant to 11 U.S.C. § 707(b)(3)(A) as a bad faith filing.

Conversion under 11 U.S.C. § 706(b)

Movants seek conversion of Debtor's case to Chapter 11 pursuant to § 706(b) of the Bankruptcy Code, which states: "On request of a party in interest and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 11 of this title at any time." 11 U.S.C. § 706(b). The burden is on the moving parties to show that the case should be converted. *In re* Home Network Builders, Inc., 2006 WL 3419791, at *4 (D. N.J. Nov. 22, 2006); *In re* Ryan, 267 B.R. 635, 639 (Bankr. N.D. Iowa 2001).

A case may only be converted to Chapter 11 if Debtor may be a debtor under Chapter 11. 11 U.S.C. § 706(d) ("Notwithstanding any other provision of this section, a case may not be converted to a case under another chapter of this title unless the debtor may be a debtor under such chapter."). The statute fails to delineate any specific grounds for conversion, but a court "'should consider anything relevant that would further the goals of the Bankruptcy Code.'" *In re* Gordon, 465 B.R. 683, 692 (Bankr. N.D. Ga. 2012) (quoting *In re* Lobera, 454 B.R. 824, 854 (Bankr. D. N.M. 2011)). The Court should also consider whether conversion would "inure to the benefit of all parties in interest," an inquiry that takes

into account whether there would be grounds to dismiss the case once it has been converted to Chapter 11 under 11 U.S.C. § 1112(b). Home Network Builders, Inc., 2006 WL 3419791, at *3 (quoting H.R.Rep. No. 595, 95th Cong., 1st Sess. at 380 (1977); S.Rep. No. 95-989, 95th Cong., 2d Sess. at 94 (1978)).

STB relies on the same evidence from its § 707(b)(3) motion, discussed *infra*, to support conversion under § 706(b) and does not provide any separate grounds for conversion. *See* STB's Brief, Dckt. No. 123. The UST delves somewhat into discrete grounds for conversion under § 706(b), arguing that "all interested parties would benefit from converting this case to chapter 11," including Debtor, who he argues would benefit from the protection of the automatic stay while he continues his litigation with K.A.P. UST's Brief, Dckt. No. 126 at 14-15.

Courts have relied on various factors to determine whether conversion under § 706(b) is appropriate. The UST, citing Gordon, mentions several of these factors in his brief: (1) the debtor's ability to repay debt; (2) the absence of immediate grounds for reconversion pursuant to 11 U.S.C. § 1112; (3) the likelihood that the debtor can confirm a Chapter 11 plan; and (4) whether parties in interest, including the debtor, would benefit from converting the case to Chapter 11.[5] *Id.* at 14; Gordon, 465 B.R. at 692-93.

---

[5]Other factors under § 706 that courts have considered include the nature of the debtor's assets and business operations and whether a separate business infrastructure exists, as well as the amount of administrative expenses that would accrue in a Chapter 11 case. Ryan, 267 B.R. at 637-638; *In re* Watkins, 132 B.R. 781 (Bankr. S.D. Fla. 1991); *In re* Lenartz, 263 B.R. 331, 335 (Bankr. D. Idaho 2001).

The UST argues that the facts of this case are similar to those in <u>Gordon</u>, and thus a similar result (conversion under § 706(b)) should follow. <u>UST's Brief</u>, Dckt. No. 126 at 15. In <u>Gordon</u>, however, the debtor was not subject to the abuse provisions of § 707(b) as Debtor here is because that debtor did not have primarily consumer debts. I find that <u>Gordon</u> is distinguishable. More importantly, I find that where both § 706 and § 707(b) may apply, the more specific provisions of § 707(b) should take precedence. *See* <u>RadLAX Gateway Hotel, LLC v. Amalgamated Bank</u>, 132 S.Ct. 2065, 2070-71 (2012) (A well-established canon of statutory interpretation is that the specific governs the general, particularly when the two are parts of the same statutory scheme).

As originally written, § 706 dealt only with conversion and § 707 dealt only with dismissal. Later amendments included the remedy of conversion in § 707(b), but only with respect to consumer debtors. Thus, for non-consumer debtors such as <u>Gordon</u>, § 706 is the only avenue to convert a Chapter 7 case. For consumer debtors, however, both sections apply. Because § 707(b) is the more comprehensive of the two, § 707(b) should be used exclusively for deciding conversion issues when the issue is bad faith or abuse. All that remains under § 706 for a consumer debtor is whether a discretionary conversion is warranted for reasons other than those that fit into the body of law interpreting bad faith and abuse under § 707(b).[6]

---

[6]Here, to the extent that § 706 remains relevant to this case, I find that Debtor has no business to reorganize, which weighs against a finding that the case should be converted. Additionally, the administrative expenses that would accrue in a Chapter 11 case would be substantial, and therefore, this factor does not support conversion. It does not appear, however, that a conversion would be futile in light of 11 U.S.C. § 1112(b) as it is not apparent at this time that any of the factors evidencing "cause" for dismissal would apply to Debtor. The

AO 72A
(Rev. 8/82)

Based on a review of the entire record, I find there to be insufficient evidence to support a discretionary conversion pursuant to § 706. Conversion would not inure to the benefit of all parties here. Therefore, Movants have not met their burden, and Debtor's case should not be converted to Chapter 11 under 11 U.S.C. § 706(b).

## Conversion or Dismissal under § 707(b)(3)(B)

Movants contend that Debtor's case is abusive, and that it should be dismissed or converted to Chapter 11. 11 U.S.C. § 707(b)(1) provides in relevant part:

> After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title it if finds that the granting of relief would be an abuse of the provisions of this chapter.

In assessing whether a filing is abusive under § 707(b)(3)(B) the Court must consider

---

principal consideration in analyzing § 706(b) is what result would benefit the creditors, debtor, other parties in interest, and the estate. In considering whether conversion would inure to the benefit of all parties, the Court agrees that the estate would benefit from conversion to Chapter 11. As noted *infra*, Debtor has the ability to pay a meaningful portion of his debt in Chapter 11 and the estate would be larger in a Chapter 11 as Debtor's earnings would be able to be included pursuant to 11 U.S.C. § 1115. However, the benefit to the estate must be balanced with the impact on Debtor, and conversion under these circumstances would not further the Debtor's interests. Debtor would not be permitted to reconvert to Chapter 7. *See* 11 U.S.C. § 1112(a)(3) ("The debtor may convert a case under this chapter to a case under chapter 7 of this title unless . . . the case was converted to a case under this chapter other than on the debtor's request."). Instead, Debtor would for five years be, like the similarly situated debtor in Lobera, "trapped in a Chapter 11 proceeding that he does not need and does not want." Lobera, 454 B.R. at 854-55. The court in Lobera went on to explain why conversion was inappropriate: "There is no business to reorganize. This is not the fresh start tha[t] Congress envisioned. Balancing this consideration against the increased estate, the Court finds that the case should not be converted to Chapter 11." *Id.* at 855.

whether the "totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." 11 U.S.C. § 707(b)(3)(B). The burden is on the movants to establish by a preponderance of the evidence that Debtor's filing is abusive. *In re* Cribbs, 387 B.R. 324, 332-33 (Bankr. S.D. Ga. 2008) (Davis, J.); *In re* McKay, 463 B.R. 915, 920 (Bankr. S.D. Ga. 2010) (Davis, J.); *In re* Ricci, 456 B.R. 89, 104 (Bankr. M.D. Fla. 2009); *In re* Golematis, slip copy, 2012 WL 3583154, at *2 (Bankr. E.D. Mich. Aug. 17, 2012).

This Court has previously utilized a totality of the circumstances analysis that required an assessment of eight non-exclusive factors.[7] *In re* Truax, 446 B.R. 638, 642 (Bankr. S.D. Ga. 2010) (Davis, J.); *In re* Allen, 411 B.R. 913, 921-22 (Bankr. S.D. Ga. 2009) (Davis, J.); *In re* James, 414 B.R. 901, 914 (Bankr. S.D. Ga. 2008) (Davis, J.). The most important factor is "whether a debtor has the ability to repay a meaningful portion of his debts from future income . . . .". James, 414 B.R. at 914. Additional factors include: (1) Whether the bankruptcy filing was precipitated by an unforeseen or sudden calamity, such as an illness or unemployment; (2) Whether the debtor is eligible for chapter 13 or chapter 11 relief; (3) Whether the debtor has made any efforts to repay his debts or negotiate with creditors; whether there are non-bankruptcy remedies available to the debtor; or whether the debtor can obtain relief through private negotiations; (4) Whether the debtor could provide a "meaningful" distribution in a chapter 13 case; (5) Whether the debtor's expenses could be

---

[7]However, in McKay I made it clear that the totality of the circumstances test is not a mere mechanical exercise. McKay, 463 B.R. at 921 ("this Court refuses to apply the factors in a mathematical way. As I am directed by the Code, I will—as always—assess the 'totality of the circumstances' holistically, not simply mechanically run down a checklist.").

reduced significantly without depriving the debtor and his or her dependents of necessities, including whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the debtor's true financial condition; (6) The period of time over which the debts were incurred; and (7) Whether the debtor has a stable source of future income. Truax, 446 B.R. at 642.

As more and more cases are presented, it becomes clear that there is considerable overlap and redundancy in these factors. Greater clarification is desirable to properly explain the Court's analysis. Thus, at this time, I will restate and combine related factors to help simplify and further elucidate the analysis:

(1) Can Debtor, from anticipated income and reasonable budget adjustments, repay a meaningful amount of his debt? Is Debtor eligible for a Chapter 13 or Chapter 11 case that hypothetically would pay a substantial or meaningful dividend to creditors over a five-year repayment period?

(2) Does Debtor have a stable source of future income sufficient to repay a meaningful amount of debt and still provide an opportunity to restore himself to a stable financial position?

(3) Did Debtor experience some unforeseeable calamity that triggered the

filing?

(4) Were the debts incurred over a significant period of time, consistent with Debtor's ability to manage them, or were they the result of recklessness or unrealistic expectations about ability to repay, such as occurs in a pre-bankruptcy spending spree?

(5) Did Debtor make good faith efforts prior to filing to deal with the debt without resorting to bankruptcy?

(6) Is Debtor using the bankruptcy process to restore Debtor's financial stability and obtain a fresh start, or to improve Debtor's financial standing, for example, by retaining all valuable property secured by outstanding debts and discharging unsecured debt in order to enable the retention of substantial assets?

(7) Are there other factors concerning the nature of Debtor's obligations that aggravate or mitigate the impact of Debtor's past behavior or future prospects?

The Court will now assess these factors as they pertain to whether the totality of the circumstances indicates Debtor's case should be dismissed or converted as abusive.

**(1) Can Debtor, from anticipated income and reasonable budget adjustments, repay a meaningful amount of his debt? Is Debtor eligible for a Chapter 13 or Chapter 11 case**

**that hypothetically would pay a substantial or meaningful dividend to creditors over a five-year repayment period?**

This case is pending as a Chapter 7 case. Currently the Trustee is holding for distribution $185,000.00 which, after estimated expenses of administration, will yield a dividend to unsecured creditors of approximately 6.6% in this Chapter 7 case. Debtor, STB, and the UST have submitted their projections in post-trial briefs, and I have reviewed their analyses of the additional sums a hypothetical Chapter 11[8] would generate from Debtor's future income over five years. Dckt. Nos. 124, 123, and 126. Upon review, I find Debtor's analysis to be the most precise, fact-based, and accurate. Debtor's analysis suggests that the amount of future income Debtor could devote to a hypothetical Chapter 11 would be approximately $377,000.00. Dckt. No. 124 at 5. If Debtor files a Chapter 11, is able to have a plan confirmed a few months hence, and there are no unforeseen reductions in disposable income for five years thereafter, the anticipated dividend would increase by 15.3% from a Chapter 7 dividend of 6.6% to 21.9%, after taking into account the money held by the Chapter 7 Trustee, Debtor's projected 2012 tax refund, and the projected administrative expenses for a Chapter 11 case.[9]

---

[8]Debtor is not eligible for Chapter 13 because of the amount of his unsecured debt. However, Debtor is eligible for Chapter 11. *See* Toibb v. Radloff, 501 U.S. 157 (1991) (an individual debtor not engaged in business is eligible to reorganize under Chapter 11). The Court notes that conversion to Chapter 11 will have a higher administrative burden than a Chapter 13. Additionally, Chapter 11 itself, although available, is no sure thing. It is not a foregone conclusion that a plan can be confirmed over creditors' objections, and there is nothing to suggest that a Chapter 11 case would be any more amicable than the legal proceedings which thus far have cost Debtor $176,212.18 in defense of the claims filed by K.A.P. and STB. Dckt. No. 130. I reject the blithe assertion of the UST that a Chapter 11 case in these circumstances would be either simple or inexpensive.

[9]In arriving at this number, I note that Debtor's counsel responded to comments made by me from the bench that the payment of $1,170.00 per month for life insurance benefits for his adult sons was questionable, by removing that expense item from his deductions. However, his budgeted housing expense of $1,250.00 for rent is unusually modest for a person of his income. If the Court needed to fine tune a budget for the purposes of this case, a higher housing expense could completely offset this life insurance expense. This would reduce the projected